Frederick J. BAINHAUER,
Jr., Appellant,

v.

LEHIGH VALLEY HOSPITAL, Allen-
town Anesthesia Associates, Inc.,
Samuel Lerner, M.D., Karen Ann
Bretz, M.D., and Jane Doe, a/k/a J.
Gerlach, Nurse Anesthetist, Appellees.

Superior Court of Pennsylvania.

Argued May 7, 2003.
Filed Sept. 11, 2003.
Reargument Denied Nov. 19, 2003.

Ronald W. Shipman, Easton, for appellant.

Sheila A. Haren, Philadelphia, for Allentown Anesthesia, Bretz and Gerlach, appellees.

Before: DEL SOLE, P.J., JOHNSON and BECK, JJ.

BECK, J.

¶ 1 This is a medical malpractice case in which Plaintiff–Appellant, Frederick J. Bainhauer, D.O., claims the trial court erred in limiting his negligence case to the theory that his harm was caused by the administration during anesthesia of the drug Neo–Synephrine. We reverse and remand for a new trial.

¶ 2 The relevant facts supported by the record are as follows. On January 31, 1997, Plaintiff underwent a parathyroidectomy at Lehigh Valley Hospital. At the time of the surgery, Plaintiff was a 62–year–old adult male who suffered from hypertension (high blood pressure). The surgery was performed by George Hartzell, M.D. Dr. Hartzell was assisted by a medical resident, Robert Watson, M.D. Trial Court Opinion at 2.

¶ 3 Anesthesia for the surgery was administered by the defendant Karen Ann Bretz, M.D., of the Allentown Anesthesia Associates, Inc. Dr. Bretz was assisted by Janice Gerlach, C.R.N.A., a nurse anesthetist. Prior to the surgery, Dr. Bretz had examined Plaintiff and had noted that he had a history of hypertension. Trial Court Opinion at 2–3.

¶ 4 Dr. Bretz and Nurse Gerlach administered anesthesia to Plaintiff at 11:55 a.m. by means of a standard anesthetic technique using Thiopental, maintained with nitrous oxide in oxygen and isoflurane. Trial Court Opinion at 3. During the operation, Dr. Bretz and Nurse Gerlach administered various drugs to Plaintiff, including Diazepam, Fentanyl, Propofol, Nimbex, Droperidol, and Reglan, as well as nitrous oxide, oxygen and isoflurane. Trial Court Opinion at 4. As a matter of routine, the Droperidol was administered to prevent post-operative nausea and vomiting. N.T. 12/13/01, at 66; N.T. 12/12/01, at 99.

¶ 5 Dr. Watson, the medical resident who assisted Dr. Hartzell in the surgery, stated in an operative note that the drug Neo–Synephrine had been administered to Plaintiff. Defense expert Norig Ellison, M.D., Letter Report, 6/26/00, at 4. However, the anesthesia record did not indicate that Neo–Synephrine had been administered, and Dr. Bretz and Nurse Gerlach both denied that they had used this drug during Plaintiff's surgery. *Id.;* N.T. 12/12/01, at 106–07; N.T. 12/13/01, at 38. According to the Physician's Desk Reference, Neo–Synephrine is contraindicated for a patient who has severe hypertension. Letter Reports of Plaintiff's expert, Mitchel B. Sosis, M.S., M.D., Ph.D., 8/21/2000; 9/29/01.

¶ 6 According to the anesthesia records, the first reading of Plaintiff's blood pres-

sure, just prior to the initiation of the administration of anesthesia was 180 systolic over 97 diastolic.[1] N.T. 12/12/01, at 90. Plaintiff experienced a marked drop in blood pressure during the first fifteen to twenty minutes after administration of the anesthesia was commenced. *Id.* at 126. When the initial incision was made shortly thereafter, Plaintiff's blood pressure rose. *Id.* at 96. As a matter of routine, in anticipation of the conclusion of the surgery, at 1:00 p.m., further administration of anesthesia was discontinued. *Id.* at 97. At 1:10 p.m., after the surgery itself was completed, Plaintiff's blood pressure dropped to its lowest point, 80 systolic over 50 diastolic. N.T. 12/13/01, at 29. The anesthesia chart shows that, simultaneous with this reading, Droperidol was being administered. N.T. 12/12/01, at 100. As a remedial measure, Dr. Bretz then increased the rate of intravenous fluid to treat Plaintiff's low blood pressure. N.T. 12/13/01, at 33. The operation ended at 1:15 p.m. Trial Court Opinion at 3.

¶ 7 Following the surgery, at 1:30 p.m., Plaintiff was moved to the post-anesthesia care unit and Dr. Bretz transferred care of Plaintiff to Carmen Montaner, M.D. N.T. 12/11–13/01, at 113, 132. Because Plaintiff's blood pressure was still low at this time, Dr. Montaner administered Wyamine intramuscularly. *Id.* After Plaintiff's blood pressure rose to a normal level, one of the post-operative nurses noted a "droop" on the right side of Plaintiff's face. N.T. 12/11–13/01, at 113. Plaintiff contended at trial that he had suffered a stroke as a result of the drop in his blood pressure and that he has continuing residual neurologic deficits. Trial Court Opinion at 5.

¶ 8 Plaintiff, himself a Doctor of Osteopathy, commenced an action on February 16, 1999, by filing a *pro se* complaint naming as defendants Allentown Anesthesia Associates, Inc., Karen Ann Bretz, M.D., Janice Gerlach, C.R.N.A., Samuel Lerner, M.D. and Lehigh Valley Hospital. The complaint alleged that the defendants were negligent in administering an "inappropriate series of medication" to Plaintiff, including Neo–Synephrine, while he was a surgical patient at Lehigh Valley Hospital. The complaint alleged that these medications were contraindicated by Plaintiff's history of hypertension. The complaint also alleged generally that the defendants failed to utilize the proper degree of skill, care and knowledge in providing anesthesia services to Plaintiff, and that they had failed to provide proper follow-up care after his surgery when he was suffering from hypotension (low blood pressure). Plaintiff's Complaint, 2/16/99, at 4.[2]

¶ 9 In response to the suit, the defendants obtained and submitted an expert report of Norig Ellison, M.D., dated June 26, 2000. Dr. Ellison also authored subsequent reports and testified at trial on behalf of the defendants. Trial Court Opinion at 5. In his initial report, Dr. Ellison identified Droperidol as a drug that "has mild hemodynamic effects, including decreased blood pressure and pulse." Letter

---

1. Monitoring equipment read the patient's blood pressure continually and recorded the readings at five minute intervals.

2. Ronald Shipman, Esq., later entered his appearance on behalf of Plaintiff. After discovery, by stipulation of the parties, the complaint was dismissed as to the defendants Samuel Lerner, M.D., and Lehigh Valley Hospital. Trial Court Opinion at 5. Plaintiff did not present any evidence as to the standard of care of a nurse anesthetist. Therefore, after the close of Plaintiff's case, a compulsory nonsuit was granted by the court as to defendant Janice Gerlach, the nurse anesthetist. Trial Court Opinion at 7. Liability against Allentown Anesthesia Associates, Inc. was asserted solely on the theory of vicarious liability for Dr. Bretz's alleged negligence. *Id.*

Report of Norig Ellison, M.D., 6/26/00, at 4.

¶ 10 Plaintiff submitted an expert report from Mitchel B. Sosis, M.S., M.D., Ph.D., dated September 29, 2001. In his expert report, Dr. Sosis pointed out that, according to Dr. Hartzell's operative report, Neo–Synephrine had been administered to Plaintiff for the drop in his blood pressure during the surgery. Dr. Sosis stated that Neo–Synephrine is contraindicated for patients such as Plaintiff with a history of severe hypertension. Dr. Sosis noted that proper care would have prevented the precarious drop in Plaintiff's blood pressure post operatively. He concluded that the anesthetic care received by Plaintiff during the surgery was below the standard of care, and that Plaintiff had suffered a stroke as a result. Letter Report of Mitchel B. Sosis, M.S., M.D., Ph.D., 9/29/01.

¶ 11 In accordance with the Pennsylvania and Lehigh County Rules of Civil Procedure, the parties submitted pretrial statements, which were reviewed by the court and counsel at a pretrial conference. Material contained in Plaintiff's Rule 212 Pretrial Memorandum included, *inter alia*, reference to Plaintiff's expert's report and its allegations of substandard anesthesiology care, as well as substandard care of a hypertensive patient. Pretrial Memorandum of the Plaintiff, 11/16/01, at 2–3, and Exhibits attached. Plaintiff's Memorandum consisted of several pages and exhibits. However, according to the trial court, pursuant to Lehigh County Local Rule of Civil Procedure 212, under the section entitled "Legal and Factual Issues," Plaintiff identified only three such issues to be determined at trial. All three issues focused on the alleged use and effect of Neo–Synephrine during Plaintiff's surgery. The trial court found that Plaintiff was therefore restricted in trying the case solely on the "Neo–Synephrine theory" of negligence.

¶ 12 At trial, Plaintiff presented Dr. Sosis as his sole expert witness. Dr. Sosis testified in support of the Neo–Synephrine theory of negligence, *i.e.*, that Neo–Synephrine was administered during Plaintiff's surgery and that this was a deviation from the standard of care. N.T. 12/11–13/01, at 48–53. Dr. Sosis was also questioned as to the effect of each and every drug listed in the anesthesiology report as having been administered to Dr. Bainhauer during the course of the surgical procedure. *Id.* at 26–28. While such questions (and their answers) were unopposed by defense counsel, as soon as a question raised possible contraindications for the administration of Droperidol in a hypertensive patient such as Plaintiff during a severe and sustained drop in blood pressure, defense counsel lodged an objection on the ground that such question solicited information beyond the fair scope of Dr. Sosis's pretrial expert report. *Id.* at 33. The objection was sustained. *Id.* at 34.

¶ 13 For the defense, Dr. Ellison testified that the care and treatment provided by Dr. Bretz conformed to the standard of care for anesthesiologists. N.T. 12/11–13/01, at 136. Dr. Ellison confirmed numerous times under oath that, while he testified in the first person, the opinions he expressed were not merely his personally, but reflected the standard of care in anesthesiology. *Id.* at 121, 131. On cross examination he was asked, without objection, about a reference in the anesthesia records to the administration to Plaintiff of Droperidol at 1:10 p.m. N.T. 12/11–13/01, at 151. The anesthesia records also indicated that at 1:10 p.m. Plaintiff's blood pressure was at its lowest point during the surgery. *Id.* at 149. Dr. Ellison testified that if Plaintiff's blood pressure had been

as low as recorded at 1:10 p.m., he "certainly would not have begun the administration of Droperidol at that time." *Id.* at 151.

¶ 14 Nonetheless, over strenuous objection by Plaintiff's counsel, prior to closing arguments, the trial court instructed the jury to disregard any testimony concerning Droperidol and ruled that the only theory of negligence that would be submitted to the jury was the Neo–Synephrine theory. Appellant's Brief at 21–22. The jury was charged accordingly. N.T. 12/11–13/01, at 216–239.

¶ 15 The jury ultimately found no negligence on the part of Defendants. Plaintiff–Appellant Bainhauer (hereinafter Appellant) requested a new trial, which motion was denied. Trial Court Opinion at 1. We reverse.

¶ 16 Appellant raises three issues in this appeal requesting a new trial.[3]

1. Whether the trial court erred in excluding testimony by Appellant's expert Dr. Sosis that the administration of Droperidol contributed to the Appellant's hypotension and therefore deviated from the standard of care where Dr. Sosis's expert report did not identify the administration of Droperidol specifically as a contributor to the hypotension, but did opine "that the anesthesia care provided to Dr. Bainhauer during neck surgery was below the standard and constituted medical malpractice."

2. Whether the trial court erred in instructing the jury that all testimony concerning Droperidol is stricken and all questions concerning Droperidol are to be disregarded where

Appellees' (Allentown Anesthesia Associates, Inc. and Karen Ann Bretz, M.D.) medical expert describes the use of Droperidol in one of his expert reports and where this expert, on cross examination, without objection, opined that such use of Droperidol was a deviation from the standard of care.

3. Whether the trial court erred in refusing to submit the case to the jury on the question as to whether the failure to maintain Appellant's blood pressure was a deviation from the standard of care on the basis that that question was not listed in Appellant's pre-trial memorandum under the "Legal and Factual Issues" section, even though the memorandum cited Appellant's expert's report stating that, "It is critical that when conducting an anesthetic for a person such as Dr. Bainhauer who suffers from severe hypertension, periods of hypotension or low blood pressure must be prevented in order to prevent complications such as a stroke."

Appellant's Brief at 4–5.

¶ 17 Initially we note that the decision of whether to grant a new trial is within the sound discretion of the trial court. *Peterson v. Shreiner*, 822 A.2d 833, 836 (Pa.Super.2003). We will not disturb the trial court's decision unless the court palpably abused its discretion or committed an error or law. *Id.*

¶ 18 Pennsylvania Rules of Civil Procedure require that an expert's testimony at

---

**3.** Pennsylvania Rules of Appellate Procedure require that "The statement of the questions involved … must never exceed one page." Pa.R.A.P. 2116(a). Here, however, Appellant's Statement of the Questions Involved fills two pages. Nonetheless, as we see the three issues as highly interrelated to one another and to errors made by the trial court, we will consider all three.

trial be limited to the *fair scope* of his deposition testimony or pretrial report:

> To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings under subdivision (a)(1) or (2) of this rule, the direct testimony of the expert at the trial may not be inconsistent with or go beyond the *fair scope* of his or her testimony in the discovery proceedings as set forth in the deposition, answer to an interrogatory, separate report, or supplement thereto ....

Pa.R.C.P. 4003.5(c) (emphasis supplied).

¶ 19 Appellant's expert, Dr. Sosis, issued an expert report prior to trial in which he, *inter alia,* enumerated the substances administered to Appellant over the duration of his surgical procedure, including "Droperidol 0.625 mg." The report went on to opine:

> that the anesthesia care that Dr. Bainhauer received for his neck surgery was below the standard of care and constitutes medical malpractice. It is critical that when conducting an anesthetic for a person such as Dr. Bainhauer, who suffers from severe hypertension, periods of hypotension or low blood pressure, must be prevented in order to prevent complications such as a stroke. This was clearly not done in this case.

Mitchel B. Sosis, M.S., M.D., Ph.D., Letter Report, 9/29/01, at 1–2.

¶ 20 During direct examination of Dr. Sosis, he was asked to describe the standard of care for anesthesiologists and whether he had an opinion as to whether or not the standard of care was met during Appellant's surgery. Dr. Sosis replied that the standard was not met and, when asked to describe the reasons for that opinion, he replied:

> The reason is that Dr. Bainhauer came in with a high blood pressure and the blood pressure was allowed to fall to

dangerously low levels, and it was kept at low levels or it was not treated and allowed to fall to these low levels for a prolonged period of time. And this could lead to lack of [blood] to the brain.

N.T. 12/11–13/01, at 32–33.

■ ¶ 21 In direct testimony, Dr. Sosis enumerated the drugs administered to Appellant throughout the surgical procedure and described the effect of each one. However, when Sosis was asked whether "the Droperidol, at the time it was given, contribut[ed] to this downward trend [in blood pressure]," Appellee objected that such an opinion was beyond the scope of Dr. Sosis's expert report. The trial court sustained the objection. We disagree.

> [I]n deciding whether an expert's trial testimony is within the fair scope of his report, the accent is on the word "fair." *The question to be answered is whether, under the circumstances of the case, the discrepancy between the expert's pretrial report and his trial testimony is of a nature which would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the appropriate response.*

*Andaloro v. Armstrong World Ind., Inc.,* 799 A.2d 71, 84–85 (Pa.Super.2002) (emphasis in original) (quoting *Chanthavong v. Tran,* 452 Pa.Super. 378, 682 A.2d 334, 340 (1996)).

■ ¶ 22 Here, Appellees were on notice *via* Dr. Sosis's report that allowing a sustained drop in blood pressure in a patient such as Dr. Bainhauer breached the standard of care for anesthesiologists. Appellees' act of administering dosages of substances Dr. Sosis enumerated in the report, alone or in combination, or their failure to take remedial measures once they perceived the drastic and sustained drop in Dr. Bainhauer's blood pressure

formed, in part, his allegations of malpractice. We see no unfair surprise in Appellees' having to prepare a defense of their approach to this hypertensive patient's anesthesia care which incorporated the use of each and every one of the drugs administered to him and listed, as well, in Dr. Sosis's report, and against Appellant's allegation "that the anesthesia care provided to Dr. Bainhauer during neck surgery was below the standard and constituted medical malpractice."[4] Thus, we find it an abuse of discretion to have prohibited Dr. Sosis from offering his opinion as to the role the enumerated drugs, including Droperidol, may have played in alleged substandard anesthesia care of Dr. Bainhauer.

¶ 23 Appellant next challenges the trial court's instruction to the jury that "all testimony concerning Droperidol is stricken and all questions concerning Droperidol are to be disregarded." We find error in this instruction. Droperidol was squarely injected into the case by the defense expert. Specifically, testimony concerning Droperidol arose during Appellant's cross examination of Appellees' expert witness, Norig Ellison, M.D. Appellant's counsel referred Dr. Ellison to his report of June 26, 2000 and had him read, "Droperidol has mild hemodynamic effects including decreased blood pressure and pulse." N.T. 12/11–13/01, at 148. In addition to reading from his report, Dr. Ellison commented, "Droperidol will lower blood pressure. It's not going to raise blood pressure." *Id.* at 147. Appellant next referred Dr. Ellison to an exhibit in the form of a graph depicting the patient's blood pressure lev-

els throughout the procedure coincidental with the administration of the various drugs. Commenting on the "administration of Droperidol at 13:10 [o'clock],"[5] Dr. Ellison opined, "Whether this drop [in blood pressure] is the end result of that Droperidol, if I had seen that drop I certainly would not have given a drug at that time that was going to—that had any propensity to lower blood pressure . . . I would have waited until the pressure came back up." *Id.* at 151. When Appellant's counsel asked Dr. Ellison whether, when the administration of anesthesia is turned off there is "normally" a rise in blood pressure, Dr. Ellison replied yes. Appellant's counsel then referred to the graphed time line to have Dr. Ellison confirm that at the point where the anesthesia was turned off Dr. Bainhauer's blood pressure dropped. In reply, Dr. Ellison said, "And that is why I suspect that the Droperidol was given just slightly before the drop, to explain the drop because it shouldn't drop otherwise there." *Id.* at 155–56.

¶ 24 Despite testimony by Dr. Ellison to the contrary, the trial court found that Dr. Ellison's testimony was merely "his own personal standard of care and not the recognized standard of care among anesthesiologists." The court then concluded "such testimony is insufficient as a matter of law to establish negligence."

▮ ¶ 25 Here, Appellees' expert offered testimony, without objection, as to a material fact at issue in this case. Specifically, he made the connection between the patient's further drop in blood pressure

---

**4.** As noted, *supra*, Appellees' expert, Norig Ellison, M.D., submitted several expert reports. In the first one, dated June 26, 2000, even before Dr. Sosis authored his report, Ellison addresses the issue of Droperidol as follows: "Droperidol has mild hemodynamic effects, including decreased blood pressure and pulse." Norig Ellison Letter Report,

6/26/00, at 4. Thus, Appellant's expert's proffered testimony about Droperidol was not even "theoretically" an unfair surprise, and, Appellees' expert was *actually* informed of allegations as to Droperidol's hemodynamic effects.

**5.** 1:10 p.m.

and the administration of Droperidol and he opined that he, the expert on the standard of care, would not have administered the drug at that time, but would have waited until the patient's blood pressure rose.[6]

¶ 26 Throughout both direct and cross examination, Dr. Ellison spoke in the first person. Counsel for Appellees stopped him on occasion to say, "Now, Doctor, when you say I— ... I want to make it perfectly clear on the record so there is no question. When you give opinions and statements from that witness stand today, you are doing so as what constitutes the standard of care. Is that correct?" Dr. Ellison replied, "Yes, I am. I should be saying we, and by we I mean the community of anesthesiologists who care for patients having general anesthesia for surgical procedures, also for regional anesthesia." N.T. 12/11–13/01, at 121–22. Thus, the trial court erred in concluding, as it did, that Dr. Ellison's testimony was merely his personal opinion rather than the expression of the standard of care among anesthesiologists. Trial Court Opinion at 16. As such, Dr. Ellison's testimony is both competent and relevant on the issue of Droperidol and therefore admissible. We conclude that Dr. Ellison squarely addressed the issue of Droperidol. We also find error in the court's not permitting Dr. Sosis to testify about Droperidol. Therefore, we find that the court's instructing the jury that all questions concerning Droperidol are to be disregarded to be reversible error.

¶ 27 Appellant next challenges the trial court's refusal to instruct the jury on any theory of negligence except what it referred to as the Neo–Synephrine theory. The Neo–Synephrine theory is a specific allegation by the Appellant that Neo–Synephrine, a drug that is shown in the operative report to have been administered to the patient, is contraindicated for patients with severe hypertension, like Dr. Bainhauer. Essentially, Neo–Synephrine causes the blood pressure to rise and thereby poses a danger to persons with already hyper-elevated blood pressure. Appellant requested that additional theories of negligence be submitted to the jury, namely, the failure of the anesthesiologist to maintain adequate blood pressure levels in a hypertensive patient and specifically the untimely administration of Droperidol as the patient's blood pressure was dropping.

¶ 28 The trial court instructed the jury:

A plaintiff who brings a medical negligence case must produce expert medical testimony to establish the recognized standard of medical care attributable to the defendant physician under the circumstances. The medical expert testimony must establish in what way the doctor whose conduct is being challenged departed from the appropriate standard of care when the doctor treated the patient.

Trial Court Opinion at 17.

¶ 29 The court limited the jury to consideration of whether the administration of Neo–Synephrine constituted negligence.

¶ 30 Relying on Pennsylvania and Lehigh County Rules of Civil Procedure,[7] the trial court restricted Appellant's triable is-

6. Appellees argue that we should not consider this cross examination because it was "irrelevant and highly improper." Appellees' Brief at 24. They base their argument on the trial court's decision to bar Appellant's expert from testifying about Droperidol. We note that we found error in the trial court's ruling barring the testimony of Appellant's expert about the drug.

7. Pa.R.Civ.P. 212.2 and Leh.R.C.P. 212.2

sues to those listed in its Pretrial Memorandum under the "Legal and Factual Issues" section, despite the fact that the Memorandum consisted of several more pages incorporating the theories of negligence alleged in Appellant's expert's report, and numerous exhibits, including Appellant's expert report itself. Essentially, the trial court disregarded all but the "Legal and Factual Issues" section in ruling that any issue not contained therein was waived because it would constitute unfair surprise to Appellees, as they would be "led to believe that the only theory of medical negligence to be asserted at trial was the Neo–Synephrine theory." Trial Court Opinion at 12. We disagree.

¶ 31 Lehigh County Local Rule of Civil Procedure 212 is derived from Pennsylvania Rule of Civil Procedure 212.2, which addresses the content and sanctions as to pretrial statements for civil actions to be tried by jury. Pennsylvania Rule 212.2 enumerates what the contents of the pretrial statement shall consist of; there are no instructions as to format, and no requirement for a "Legal and Factual Issues" section. However, Pennsylvania Rule 212.2's list does allow for

> (7) such *additional information* as the court by local rule or special order may require.

Pa.R.Civ.P. 212.2(a)(7)(emphasis added).

¶ 32 It is through this provision that Lehigh County Local Rule of Civil Procedure 212 derives its authority. We fail to see that such authority, so granted, enables Lehigh County to disregard related issues adduced at trial. To do so effectively elevates form over function. Clearly, that is not the purpose of Pa.R.Civ.P. 212.2, as evidenced by subsection (c),

which addresses sanctions for non compliance.

¶ 33 Subsection (c) states as follows:

(c) Where the trial judge determines that unfair prejudice shall occur as the result of non-compliance with subdivisions (a) and (b)[8], the trial judge shall grant appropriate relief which may include

> (1) the preclusion or limitation of the testimony of
>> (i) any witness whose identity is not disclosed in the pretrial statement, or
>> (ii) any expert witness whose opinions have not been set forth in the report submitted with the pre-trial statement or otherwise specifically referred to in the pretrial statement, consistent with Rule 4003.5, and
>
> (2) the preclusion of exhibits not listed in the pretrial statement and made available.

Pa.R.Civ.P. 212.2(c).

 ¶ 34 The purpose of a pretrial statement is to prevent surprise. *Wiley v. Snedaker*, 765 A.2d 816 (Pa.Super.2000). Here, the trial court precluded all testimony on Droperidol because Neo–Synephrine was the only drug specifically mentioned under the "Legal and Factual Issues" section of Appellant's Pretrial Statement. As we have found error in the trial court's ruling barring the testimony of Appellant's expert about Droperidol, that determination signifies that such testimony was consistent with Rule 4003.5. Appellant therefore complied in every way with Subsection (c).

¶ 35 We find, therefore, that the trial court abused its discretion in sanctioning Appellant by precluding testimony on Droperidol and limiting the triable theory of

---

**8.** Subsection (b) requires that the exhibits (or copies) required by Subsection (a) to be listed in the Pretrial Statement be made available.

liability to Neo–Synephrine under Rule 212.

¶ 36 Judgment vacated. Remanded for new trial consistent with this opinion. Jurisdiction relinquished.