J-A04002-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| JOHN MUSIKA AND LINDA MUSIKA, H/W | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellants | : | |
| | : | |
| v. | : | |
| | : | No. 599 EDA 2023 |
| ABINGTON - JEFFERSON HEALTH, ABINGTON HEALTH, ABINGTON HEALTH PHYSICIANS, ABINGTON MEMORIAL HOSPITAL, JENNIFER V. FRABIZZIO, JONAS J. GOPEZ, HANS Y. KIM, LANSDALE HOSPITAL, NEURSURGICAL ASSOCIATES OF ABINGTON, STEPHEN PRIPSTEIN, RADIOLOGY GROUP OF ABINGTON PC AND WILLOW GROVE OPEN MRI, INC. | : | |

Appeal from the Judgment Entered February 2, 2023
In the Court of Common Pleas of Montgomery County
Civil Division at No: 2015-24722

BEFORE: STABILE, J., McLAUGHLIN, J., and COLINS, J.[1]*

MEMORANDUM BY STABILE, J.:                    **FILED JANUARY 09, 2025**

Appellants, John Musika and Linda Musika, appeal from the February 2, 2023 judgment entered against them in their medical malpractice action against Appellees. We affirm.

_____

* Retired Senior Judge assigned to the Superior Court.

This case arises from Appellees' alleged failure to diagnose and properly treat Appellant's[2] chordoma, a rare form of spinal tumor. Appellant had a history of chronic backpain. He saw his primary care physician ("PCP") in August of 2011 for the problem, and his doctor ordered an MRI (the "2011 MRI"). In September of 2011, Appellee Dr. Stephen Pripstein interpreted that MRI but allegedly failed to note the presence of a mass on the L-4 vertebrae of Appellant's spine.

The problems persisted for two more years and Appellant's PCP ordered another MRI, which was performed on September 12, 2013 (the "2013 MRI"). Appellee Dr. Jennifer V. Fabrizzio interpreted the 2013 MRI and noted a mass on Appellant's L-4 vertebrae but did not diagnose a chordoma. She referred Appellant to Appellee Dr. Jonas J. Gopez. A visit with Dr. Gopez was scheduled for September 16, 2013. In the interim, Appellant underwent a CT scan of his chest, abdomen, and pelvis on September 14, 2013, which was interpreted by Appellee Dr. Hans Y. Kim. Notes from Appellant's September 16, 2013, visit with Dr. Gopez indicate that he reviewed the 2013 MRI but not the CT scan.

Dr. Gopez did not diagnose a chordoma, but scheduled Appellant for decompressive surgery and an open biopsy on September 26, 2013, at Appellee Abington Memorial Hospital. Appellants allege that Dr. Gopez had

_____

[2] Throughout this memo, "Appellant" in the singular will refer to John Musika and "Appellants" in the plural will refer to both John and Linda Musika.

no experience diagnosing or treating chordoma prior to that date. Appellants further allege that a biopsy specimen was sent to the Abington pathology lab for preliminary diagnosis during Appellant's surgery, and that the lab informed Dr. Gopez during the surgery that the preliminary diagnosis was chordoma. Appellants claim that Dr. Gopez's performance of the surgery after receiving the preliminary diagnosis violated the standard of care. Dr. Gopez denied that he received a preliminary diagnosis of chordoma during the surgery. He claimed he told Appellants after the operation that he removed a large section of the mass and sent it to a lab for analysis.

Appellant underwent follow up treatment with Drs. Francis Hornicek and Gregory Cote at Massachusetts General Hospital ("MGH"), beginning in October of 2013. Dr. Hornicek operated on Appellant in February of 2014, removing the remainder of the chordoma left behind by Dr. Gopez. Dr. Hornicek's notes from the operation indicate that Dr. Gopez's performance of the surgery made Dr. Hornicek's procedure riskier and more complicated than it otherwise would have been.

Appellants filed their complaint on October 16, 2015. Appellants advised the court prior to trial that they reached a settlement agreement with Dr. Pripstein, though Dr. Pripstein participated in the trial represented by counsel and Appellants introduced evidence against him. Appellants agreed to discontinue their cases against Abington Health, Abington Health Physicians, Neurosurgical Associates of Abington, Abington-Jefferson Health, and

Lansdale Hospital. Drs. Fabrizzio and Kim, Radiology Group of Abington, P.C., and Willow Grove Open MRI, Inc. were dismissed with prejudice prior to trial. Appellants proceeded to trial against Dr. Gopez and Abington Memorial Hospital, with Dr. Pripstein also participating as a defendant.

Against Dr. Pripstein, Appellants sought to prove damages resulting from his alleged violation of the standard of care in interpreting the 2011 MRI, thus allowing the chordoma to grow larger until Appellant's surgery in 2013. Against Dr. Gopez, Appellants sought to prove that he should not have performed a biopsy and back surgery at the same time. Rather, Appellants claim he should have done a needle biopsy prior to surgery. By proceeding without knowing that the mass was a chordoma, Appellant claims, Dr. Gopez performed the surgery in a way that increased the risk of the chordoma recurring because he cut into the tumor rather than removing it whole, requiring Dr. Hornicek to remove the remainder of the tumor in the subsequent procedure at MGH.

After the completion of discovery, Appellants served Appellees with two expert reports. In a report dated December 3, 2018, Dr. Earl W. Brien, an orthopedic surgeon with a specialty in the treatment of musculoskeletal tumors, opined that Dr. Gopez deviated from the standard of care by performing the surgery and biopsy at the same time. Dr. Brien opined that Dr. Gopez's errors, including his failure to diagnose a chordoma from the 2013 MRI, his failure to confirm that diagnosis by needle biopsy, and his subsequent

failure to remove the chordoma whole, without cutting into it, put Appellant at greater risk for a recurrence.

In a report dated November 18, 2018. Dr. Nancy M. Major, a musculoskeletal radiologist, opined that Dr. Pripstein deviated from the standard of care by failing to diagnose the chordoma during his September 2011 interpretation of Appellant's first MRI. Appellants took *de bene esse* depositions of Drs. Cote and Hornicek on October 6, 2022 and October 18, 2022, respectively. The trial court eventually permitted portions of Dr. Cote's testimony in rebuttal. No part of Dr. Hornicek's testimony was admitted into evidence.

On November 7, 2022, nearly four years after the first reports and one week before trial, Appellant filed supplemental reports from Drs. Brien and Major. Dr. Major, in her second report, addressed the actions of Dr. Gopez as well as Dr. Pripstein. Thus, these reports were served following the recorded trial testimony of Drs. Cote and Hornicek.

Trial commenced on November 14, 2022. On November 18, 2022 the jury found that Dr. Gopez was not negligent; that Dr. Pripstein was negligent; and that Dr. Pripstein's negligence was the cause in fact of harm to Appellant. The jury awarded Appellants a total of $1 million for past and future non-economic damages and loss of consortium.

Appellants filed a motion for post-trial relief, alleging that the trial court erred in precluding Dr. Major from testifying as to the information contained

in her November 7, 2022, supplemental report and by precluding Dr. Brien from testifying as to some of the information contained in his November 7, 2022, supplemental report. Appellants also claimed the trial court erred in precluding the testimony of Drs. Cote and Hornicek, Appellant's treating physicians. Finally, Appellants claimed the trial court erred in refusing to give an increased risk of harm instruction as to Dr. Gopez. The trial court denied Appellants' post-trial motions by order of October 3, 2023. The verdict was reduced to judgment on February 2, 2023. Appellants' timely appeal followed. Dr. Pripstein has not filed a cross appeal.

Appellants present five questions. All of them pertain to the defense verdict in favor of Dr. Gopez. We paraphrase them as follows. First, Appellants argue that the trial court erred in the limitations it placed on the supplemental opinions of Drs. Major and Brien filed shortly before trial. Second, Appellants argue the trial court erred in not permitting Dr. Brien to rely on the testimony and operative notes of Drs. Hornicek and Cote. Third, Appellants argue that the trial court erred in not giving an increased risk of harm jury instruction as to Dr. Gopez. Fourth, Appellants argue the trial court erred in precluding the recorded testimony of Drs. Hornicek and Cote in their case-in-chief. Finally, and related to the previous argument, Appellants claim the trial court erred in admitting portions of Dr. Cote's recorded testimony only in rebuttal. Appellants' Brief at 6-7. We address these issues in turn.

We begin with our standard of review for an appeal from an order denying a motion for new trial:

> Our standard of review when faced with an appeal from the trial court's denial of a motion for a new trial is whether the trial court clearly and palpably committed an error of law that controlled the outcome of the case or constituted an abuse of discretion.  In examining the evidence in the light most favorable to the verdict winner, to reverse the trial court, we must conclude that the verdict would change if another trial were granted.  Further, if the basis of the request for a new trial is the trial court's rulings on evidence, then such rulings must be shown to have been not only erroneous but also harmful to the complaining parties.  Evidentiary rulings which did not affect the verdict will not provide a basis for disturbing the jury's judgment.

*Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 707 (Pa. Super. 2000), *appeal denied*, 785 A.2d 90 (Pa. 2001) (citation omitted).

Appellants first argue that the trial court erred in limiting their use of the "rebuttal" reports of Drs. Major and Brien submitted shortly before trial. Decisions on the admissibility of expert testimony rest within the sound discretion of the trial court, and we will reverse only if the trial court abuses its discretion.[3]  *Snizavich v. Rohm and Haas Co.*, 83 A.3d 191, 194 (Pa.

---

[3]  The Pennsylvania Rules of Evidence provide as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;

*(Footnote Continued Next Page)*

Super. 2013), *appeal denied*, 96 A.3d 1029 (Pa. 2014). As noted just above, Appellants can obtain relief only if a trial court error was prejudicial.

The trial court excluded large portions of Appellants' late-filed expert reports because those reports offered opinions that fell outside of the fair scope of the reports they filed four years earlier, thus depriving the defendants of a fair opportunity to rebut them. Per the applicable rule of procedure, "the direct testimony of the expert at the trial may not be inconsistent or go beyond the fair scope of his or her testimony in the discovery proceedings as set forth in the deposition, answer to an interrogatory, separate report, or supplement thereto." Pa.R.Civ.P. 4003.5(c). "Where the full scope of the expert's testimony is presented in the … separate report … this will fix the permissible limits of his testimony at the trial." Pa.R.Civ.P. 4003.5, Explanatory Comment—1978.

> [I]n deciding whether an expert's trial testimony is within the fair scope of his report, the accent is on the word 'fair.' The question to be answered is whether, under the circumstances of the case, the discrepancy between the expert's pre-trial report and his trial testimony is of a nature which would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the appropriate response.

---

(b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and

(c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702.

*Sutherland v. Monongahela Valley Hosp.*, 856 A.2d 55, 59 (Pa. Super. 2004) (quoting *Bainhauer v. Lehigh Valley Hosp.*, 834 A.2d 1146, 1151 (Pa. Super. 2003)).

We discern no abuse of discretion in the trial court's exclusion of the supplemental reports of Drs. Major and Brien. Regarding Dr. Major, her November 18, 2018, report posited that Dr. Pripstein violated the standard of care in his interpretation of the 2011 MRI by failing to note the mass on Appellant's L-4 vertebrae. She did not address the actions of Dr. Gopez or Dr. Fabrizzio, the original interpreter of the 2013 MRI. In her November 7, 2022, report, however, Dr. Major opined for the first time that Drs. Gopez and Fabrizzio violated the standard of care in their interpretation of the 2013 MRI. Because Dr. Major was to be the expert on the negligence of Dr. Pripstein, her late-filed supplemental report opining on the professional negligence of Drs. Gopez and Fabrizzio was indeed beyond the scope of her original report.

Appellants argue, however, that Dr. Major's original report criticized Dr. Pripstein for failing to observe the mass in the 2011 MRI and order a follow-up biopsy, and that the same criticism applies to Drs. Fabrizzio and Gopez with regard to the 2013 MRI. Appellants' Brief at 45. Even if we were to accept this argument, Appellants cannot establish prejudicial error. By the time of Dr. Major's supplemental report, Dr. Fabrizzio had been dismissed with prejudice from the case. And Dr. Brien testified at length that Dr. Gopez should have done a needle biopsy of the mass before performing the operation

on it. Appellants fail to explain why Dr. Major's report and testimony on the need for a biopsy after the 2013 MRI would have been anything more than cumulative of Dr. Brien. The trial court's ruling did not deprive them of expert testimony on the alleged negligence of Dr. Gopez in his actions after the 2013 MRI. Appellant's have failed to establish any grounds for relief on this point.

Next, Appellants claim that Dr. Major's report should have been admissible as rebuttal to Appellees' expert report of Dr. Gordon Sze. Appellants' Brief at 45. Appellants explain that Dr. Sze's report, which was produced on July 25, 2019, stated that the mass evident in the 2011 MRI should not have been considered a chordoma. *Id.* at 52. Likewise, Dr. Sze opined that chordoma should not have been included in the differential diagnosis of the 2013 MRI or the 2013 CT scan. *Id.*

First, we discern no abuse of discretion in the trial court's decision to exclude Dr. Major's supplemental report to the extent it was intended as rebuttal:

> [T]he proposed rebuttal report was not issued until three (3) years after Dr. Sze's expert report and only a few short days before prior [sic] to the start of trial. [Appellants] failed to provide a sufficient explanation or reason for why the report was issued three (3) days before trial and several years after Dr. Sze's report. Accordingly, if this court were to have allowed the supplemental report of Dr. Major, [Appellees] would likely have been significantly prejudiced by their inability to evaluate and prepare a response.

Trial Court Opinion, 3/29/23, at 9.

- 10 -

Regarding the 2013 MRI, for reasons we have already explained, Dr. Major's rebuttal of Dr. Sze would have been cumulative of Dr. Brien's opinion and well beyond the scope of Dr. Major's original report, in which she offered no opinion on either Dr. Gopez or the 2013 MRI. Appellant's operation took place shortly after the 2013 MRI and CT scan, and Dr. Brien opined in his original report and testified extensively at trial that chordoma should have been considered a possibility and that a biopsy should have been done prior to the operation. Appellants fail to explain what they lost by not having Dr. Major say the same thing.

Regarding the 2011 MRI, the interpretation of which was the subject of Dr. Major's original report, Appellants do not point to any portion of the trial record in which Dr. Major's opinion testimony regarding Dr. Pripstein's interpretation was circumscribed. Further, Dr. Pripstein was a participant in trial despite having reached a settlement with Appellants prior to trial, and the jury found in Appellants' favor and against Dr. Pripstein. Appellants articulate no grounds on which the verdict against Dr. Pripstein might have been altered by any trial court error.

Finally, Appellants argue that, to the extent that Dr. Major's supplemental report and testimony thereon would have exceeded the scope of her original, timely report, Appellees were required to prove they would have been prejudiced thereby. This argument ignores the fact that, on appeal, Appellants must establish prejudicial error in order to receive a new trial. They

have not done so. For the foregoing reasons, we discern no reversible error in the trial court's exclusion of Dr. Major's supplemental report.

Regarding, Dr. Brien's eve-of-trial supplemental report, Appellants argue that the trial court erred in forbidding Dr. Brien to opine on "what a CT-guided needle biopsy entails." Appellants' Brief at 46. The trial court concluded such testimony was beyond the scope of Dr. Brien's expert report. In his original report, Dr. Brien opined that Dr. Gopez should have ordered a needle biopsy before performing surgery, because a needle biopsy was less likely to contaminate the area and thereby reduce the risk of a future recurrence. An explanation of what a needle biopsy entails is plainly within the scope of that opinion. The trial court erred in finding otherwise.

We now examine the record to determine whether the court's error was prejudicial. The relevant portion of the trial transcript reads as follows:

> Q. Now, in terms of CT guided needle biopsy, why don't you just explain for us what that actually entails. What does that consist of?
>
> A. So it starts after you review the imaging studies. You have to generate an order that states you want a CT guided biopsy.
>
> At that point the CT guided biopsy is set up through the radiology department. The way we do it, and I think is the standard, is that you have the radiologist define the pathway of the biopsy. And in my cases I always check the pathway so I know if I have to remove it, I may want to remove the biopsy track. So we discuss had [sic] specifically the biopsy track that be [sic] we attack it, the tumor, to make the diagnosis and to limit the contamination.

> [Defense Counsel]: Your Honor, I'm going to move to strike. It's not contained within the scope of his report.
>
> THE COURT: Mr. Tumolo [Plaintiff's Counsel].
>
> MR. TUMOLO: Your Honor, it is. The doctor's report includes opinion that a CT needle biopsy should have been indicated, it would have been standard of care.
>
> * * * *THE COURT: As to that objection, that objection is sustained. That testimony is stricken. You may proceed.

N.T. Trial, 11/15/22, at 34-35.

Appellants claim the error was prejudicial because Dr. Christopher Loftus, in his report on behalf of Appellees, opined that a needle biopsy posed a risk of neurological damage in the event of post-biopsy tumor bleeding. Report of Dr. Loftus, 7/24/2019, at 9 (pagination ours).[4] Dr. Loftus opined in his report that "it is unreasonable to suggest that a needle biopsy would have been a completely safe and simple expedient to resolve [Appellant's] need for tissue diagnosis." *Id.*

There are several problems with Appellants' argument. First, they point to nothing in Dr. Brien's original or supplemental reports that would have refuted Dr. Loftus on this point. That is, Dr. Brien addressed, both at trial and in his reports, what he believed were the unacceptable risks of the open biopsy Dr. Gopez performed. He never testified, nor did either of his reports proffer any testimony, that a needle biopsy would not have entailed any risk to

_____

[4] Dr. Loftus' report appears in the record as Exhibit D to Appellants' brief in support of their November 28, 2022, motion for post-trial relief.

Appellant. He testified, rather, that a needle biopsy was the standard of care given the results of the 2013 MRI. His supplemental report stated that "[n]eedle biopsy minimizes local contamination and reduces the risk of local recurrence and possible spread of disease as compared to performing an intralesional partial excision." Supplemental Report of Dr. Brien, 11/7/22, at ¶ 2.[5] Nowhere does the supplemental report refute Dr. Loftus' description of the risks of needle biopsy.

Further, we are unpersuaded by Appellants' argument that, because of the trial court's error, the jury had no evidentiary grounds for finding that Dr. Gopez was negligent by doing an open biopsy and decompression rather than the needle biopsy. Appellants' Brief at 46. Appellants' argument ignores both the details of the stricken testimony and the details of the testimony that the jury was permitted to consider. In the stricken testimony, Dr. Brien explained how the pathway of the biopsy is determined. Dr. Brien explained that he and a radiologist discuss work together to determine the best way of making a diagnosis while limiting contamination. In other portions of his testimony, Dr. Brien explained that Dr. Gopez, by cutting into the tumor and removing a portion of it rather than removing it whole, spilled "thousands, if not millions of tumor cells" into the surrounding area. N.T. Trial, 11/15/22, at 59. Dr.

_____

[5] Dr. Brien's supplemental report appears in the record as Exhibit I to Appellants' brief in support of their November 28, 2022 motion for post-trial relief.

- 14 -

Brien also gave his reasons why Dr. Gopez should have suspected chordoma prior to the operation and thus should never have cut into the tumor. *Id.* at 33. And had Dr. Gopez confirmed in advance that the tumor was a chordoma, Dr. Brien testified, the standard of care would have been to "remove the tumor en bloc, not violating the tumor itself." *Id.* at 37. Dr. Gopez' failure in this regard increased the risk of local recurrence. *Id.* at 59.

Later, Dr. Brien testified that the open biopsy Dr. Gopez performed was "done in a location that we would have tried to avoid, or should have been avoided[.]" *Id.* at 61. The partial excision of the tumor, performed after the open biopsy, is "not how we treat chordomas." *Id.* Appellants' counsel explored this point further, without objection:

> Q. Doctor, you said the first biopsy was obtained in a location that should be avoided. You're talking about where it [Dr. Gopez's operative report] says puncture the capsule? That's the location that should have been avoided?
>
> A. Yes.
>
> Q. What location for a chordoma do you biopsy?
>
> A. Well, every chordoma is different.
>
> Q. For this chordoma, based on the 2013 mass that's present on the MRI?
>
> A. **You would do a biopsy through the pedicle, and get tissue from the bone to make the diagnosis.**

*Id.* at 62 (emphasis added). Thus, contrary to Appellants' argument, the record reveals that Dr. Brien did eventually testify as to the method of performing the needle biopsy. And it is clear throughout Dr. Brien's testimony

that he believed Dr. Gopez's procedure risked contamination of the surrounding area and recurrence. For the foregoing reasons, we discern no prejudicial trial court error.

With their second argument, Appellants claim the trial court erred in forbidding Dr. Brien to rely on the office notes of Drs. Cote and Hornicek, Appellant's treating physicians at MGH. Appellants argue that an expert medical witness would normally rely on the notes of a plaintiff's treating physician(s). Rule 703 of the Pennsylvania Rules of Evidence governs this issue:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Pa.R.E. 703.

Appellants also cite **Commonwealth v. Thomas**, 282 A.2d 693 (Pa. 1971), in which our Supreme Court wrote as follows:

> In Pennsylvania, our cases have heretofore ruled that an expert may not state a conclusion which is based on evidence not in the record. However, several jurisdictions influenced by the teaching of highly regarded legal commentators have recognized an exception to this rule and have permitted medical witnesses to express opinion testimony on medical matters based, in part, upon reports of others which are not in evidence, but which the expert customarily relies upon in the practice of his profession.
>
> As Professor Wigmore explains, 'where the information is that of an attending nurse or physician having personal observations and an interest in learning and describing accurately, there seems to be every reason for admitting testimony based in

part on this.'   3 Wigmore, Evidence s 688(4) (Chadbourn Revision).

It appears to us that the foregoing limited exception is wise and salutary, hence we adopt it as the law in Pennsylvania.

*Id.* at 698-99 (citations omitted).  This holding was later codified in Rule 703.

Dr. Brien would have relied on the notes of Drs. Hornicek and Cote to establish that Appellant's follow up treatment at MGH, and in particular the subsequent surgery performed by Dr. Hornicek, was made riskier and more complex, and that Appellant was at a greater risk of recurrence of chordoma because of Dr. Gopez's errors.  Appellants' Brief at 63-64.  As we explained above, Dr. Brien **did** testify that Dr. Gopez's errors placed Appellant at greater risk of recurrence.

As to the greater risk and complexity of the subsequent surgery performed by Dr. Hornicek, Appellant fails to state how this bolsters his case against Dr. Gopez.  There is no indication in the record that Appellant's subsequent surgery with Dr. Hornicek was unsuccessful, or that any attendant risks in that surgery resulted in harm to Appellant.  Appellants did not lodge any claims regarding the expense of Appellant's subsequent treatment at MGH.  Rather, the evidence of record is that, as of the time of trial, Appellant was cancer-free and not suffering from any complications stemming from his surgeries with Drs. Gopez and Hornicek.  Appellant's second argument does not merit a new trial.

In their third argument, Appellants claim that the trial court erred by failing to give an "increased risk of harm" standard jury instruction. Appellants' Brief at 6.

> Our standard of review regarding jury instructions is limited to determining whether the trial court committed a clear abuse of discretion or error of law which controlled the outcome of the case. Error in a charge occurs when the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue. Conversely, a jury instruction will be upheld if it accurately reflects the law and is sufficient to guide the jury in its deliberations.
>
> The proper test is not whether certain portions or isolated excerpts taken out of context appear erroneous. We look to the charge in its entirety, against the background of the evidence in the particular case, to determine whether or not error was committed and whether that error was prejudicial to the complaining party.
>
> In other words, there is no right to have any particular form of instruction given; it is enough that the charge clearly and accurately explains the relevant law.

*James v. Albert Einstein Med. Ctr.*, 170 A.3d 1156, 1163–64 (Pa. Super. 2017) (citation omitted).

Appellants requested an increased risk of harm instruction based on the evidence indicating that Dr. Gopez's failure to adhere to the standard of care for a chordoma placed Appellant at in increased risk of recurrence. The trial court declined to give the instruction, reasoning that it was not appropriate because Appellant has not suffered a recurrence. The trial court relied on *Hamil v. Bashline*, 392 A.2d 1280 (Pa. 1978) wherein our Supreme Court wrote as follows:

- 18 -

> Once a plaintiff has introduced evidence that a defendant's negligent act or omission increased the risk of harm to a person in plaintiff's position, **and that the harm was in fact sustained**, it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm.

*Id.* at 1286 (emphasis added).

A review of the pertinent law convinces us that the trial court erred. In *Zieber v. Bogert*, 773 A.2d 758 (Pa. 2001), our Supreme Court considered a case in which the plaintiff sought to introduce, as an element of damages, evidence of his increased risk of recurrence of cancer. In *Zieber*, as here, an initial misdiagnosis allowed the plaintiff's cancer to persist and worsen. After a proper diagnosis, the plaintiff received the necessary treatment and achieved remission of the cancer. Remission notwithstanding, the plaintiff presented evidence that the defendants' negligence created an increased risk of subsequent recurrence. *Id.* at 760. The *Zieber* Court held that "a doctor properly may be allowed to explain the possible future effects of an injury, and with less definiteness than is required of opinion testimony on causation." *Id.* at 761. "Consequently, it was not improper for the jury to consider the possibility of future metastasis in awarding damages." *Id.* (quoting *Gradel v. Inouye*, 421 A.2d 674, 680 (Pa. 1980)).

The *Zieber* Court distinguished *Simmons v. Pacor, Inc.*, 674 A.2d 232 (Pa. 1996), a case in which the plaintiffs in an asbestos exposure case sought damages for the increased risk of cancer, though they had yet to contract it. The *Simmons* Court held that there was no physical injury to support the

award of damages, and because the plaintiffs were not precluded from filing another action if and when they developed a malignancy (at the time of the action the plaintiffs suffered from pleural thickening). The *Zieber* Court held that the rationale of *Simmons* did not apply where the plaintiff had already contracted cancer and suffered from the defendant's negligence:

> Here, Zieber's cancer has developed and he has already suffered its debilitating effects. The requirement of a physical injury has therefore clearly been established. **Moreover, Appellees may not commence a second action, if and when the cancer recurs, based upon the same alleged negligence of Dr. Bogert in failing to properly diagnose the condition.**

*Zieber*, 773 A.2d at 762 (emphasis added).

The *Zieber* Court also refused to disturb this Court's holding in *Holmes v. Lado*, 602 A.2d 1389 (Pa. Super. 1992), *appeal denied*, 609 A.2d 168 (Pa. 1992). In *Holmes*, the plaintiff's wife underwent a mammogram, but not a biopsy, in 1982. According to the radiologist the mammogram showed no signs of a malignancy. In 1985, a biopsy showed that she had stage III breast carcinoma. The plaintiff's wife underwent a mastectomy and chemotherapy but died from metastatic breast carcinoma in March of 1987. *Id.* at 1390-91. The plaintiff filed a medical malpractice action, alleging counts of wrongful death and survival, in November of 1988. The trial court dismissed the survival action under the applicable two-year statute of limitations and this Court affirmed. The *Holmes* Court concluded that the wife had sufficient information to commence an action in 1985 when she learned that the 1982

- 20 -

mammogram could not have detected cancer; only a biopsy would have done so. *Id.* at 1392.

Summarizing the result in *Holmes*, the *Zieber* Court noted with approval that "the Superior Court rejected Mr. Holmes's argument that the metastasis, which had been diagnosed within the statute of limitations period, was a new injury for which a separate cause of action could be brought." *Zieber*, 773 A.2d at 763. "The court held that the failure to order the diagnostic tests necessary to diagnose a mass as a malignant tumor pertained to the initial cancer and not to the later metastasis." *Id.*

Based on all the foregoing, the *Zieber* Court concluded:

> In summary, we hold that evidence of the increased risk and/or fear of recurrence of cancer is **admissible for the purpose of establishing damages** in a medical malpractice case alleging a physician's negligence in failing to properly diagnose the disease. Appellants' concerns regarding the speculative nature of such damages can be presented to the jury during argument, as such challenges go to the weight, rather than the admissibility of the evidence.

*Id.* at 763 (emphasis added).[6]

Instantly, the trial court gave an increased risk of harm instruction with regard to Dr. Pripstein but not with regard to Dr. Gopez:

> [T]he court gave an increased risk of harm charge to the jury as to Dr. Pripstein since a *prima facie* case of causation based on Dr. Pripstein's failure to detect the chordoma allowed it to continue to grow undetected, to approximately an inch and a

_____

[6] The holding in *Zieber* is based on § 323(a) of the Restatement (Second) of Torts.

- 21 -

third, over two years. That was the actual harm suffered by [Appellant].

However, the court did not give the same instruction as to Dr. Gopez. The court concluded that while [Appellant] proved that Dr. Gopez's treatment increased the risk of recurrence of cancer, fortunately [Appellant] has been cancer free, and the absence of cancer in [Appellant] demonstrated that [Appellant] has not suffered any harm. …

Although this court did not provide the increased risk of harm instruction as to Dr. Gopez, it did allow [Appellants] to testify about the possibility of the reoccurrence of cancer as an element of damages.

Trial Court Opinion, 3/29/23, at 9.

Given the foregoing law and the evidence of record indicating that Dr. Gopez performed surgery in a way that increased Appellant's risk of a recurrence, the trial court erred. The reasoning in *Zieber* applies with equal force here. Appellant has already contracted cancer and has sued Dr. Gopez for failing to properly diagnose and treat the condition. Per *Zieber*, all damages arising out of Dr. Gopez's alleged negligence are to be litigated in the instant case. To require Appellant to withhold his increased risk of harm claim unless and until he suffers a recurrence of cancer would , under the law set forth above, result in a loss of that claim. The trial court therefore erred in declining to give an increased risk of harm instruction as to Dr. Gopez.

The next question is whether the trial court's error was prejudicial, given that the verdict sheet indicates that the jury found that Dr. Gopez did not breach any duty to Appellant. As noted above, the *Zieber* Court treated

increased risk of harm as an element of damages. *Id.* at 163. In other cases, we have treated increased risk of harm as relevant to causation:

> Accordingly, in cases where the plaintiff has introduced sufficient evidence that the defendant's conduct increased the risk of injury, the defendant will not avoid liability merely because the plaintiff's medical expert was unable to testify with certainty that the defendant's conduct caused the actual harm. The trial court may send **the issue of causation** to the jury upon a less than normal threshold of proof as long as reasonable minds could conclude that a preponderance of the evidence shows the defendant's conduct was a substantial factor in causing the resulting harm. The determination then rests with the jury.

*K.H. ex rel. H.S. v. Kumar*, 122 A.3d 1080, 1104–05 (Pa. Super. 2015) (emphasis added; internal citations and quotation marks omitted), *appeal denied*, 135 A.3d 586 (Pa. 2016). Because the jury in this case found no breach of duty on the part of Dr. Gopez, they did not reach causation or damages.

We are cognizant of our Supreme Court's opinion in *Jones v. Montefiore Hosp.*, 431 A.2d 920 (Pa. 1981), which ordered a new trial based on the trial court's erroneous failure to give an increased risk of harm instruction. *Jones* is distinguishable because there is no indication in that case of the basis for the jury verdicts; the opinion reports only that the jury returned defense verdicts. *Id.* at 922-23. The *Jones* Court concluded that "the jury should have been instructed to impose liability if it decided that **[defendants']** **negligent conduct** increased the risk of harm and that such increased risk was a substantial factor in bringing about the harm actually inflicted [....]" *Id.* at 924. And, finally, the Court concluded that a new trial

- 23 -

was necessary because "the jury might have reached its decision as a result of the incomplete and erroneous instruction on **causation**[.]" *Id.* at 925 (emphasis added).[7]

Appellants attempt to establish prejudicial error by relying on the cumulative effect of the trial court's errors. They claim the jury could have found a breach of duty if, for example, the trial court had not improperly excluded portions of Dr. Brien's testimony regarding the needle biopsy.[8] We have already explained or reasons for rejecting Appellants' argument on that point. In conclusion, Appellants' challenge to the omitted jury instruction does not merit relief because Appellants have failed to establish that the trial court's error was prejudicial.

With their fourth argument, Appellants claim the trial court erred in excluding the recorded deposition testimony of Drs. Hornicek and Cote.

_____

[7] Contrary to the suggestion in the concurring and dissenting memorandum ("CDM"), we are not ignoring the import of *Jones*. In this case, the verdict slip indicates that the jury found no breach of duty on the part of Dr. Gopez. Because an increased risk of harm instruction is relevant to causation and/or damages, and because the jury did not reach those issues in this case, we conclude that the absence of the instruction could not have affected the verdict. *Jones* did not address a verdict slip; there is no reason to assume that the *Jones* Court would have remanded for a new trial even if the record before it confirmed that the jury never reached the issues of causation or damages.

[8] We observe, in response to the CDM, that Appellants expressly argued that the erroneous jury instruction was "compounded" by this additional error. Appellants' Brief at 65. For the reasons explained in the main text, we conclude the absence of the increased risk of harm instruction, on its own or in tandem with other alleged errors, could not have affected the verdict.

Appellants argue that Drs. Cote and Hornicek formed their medical opinions in furtherance of Appellant's treatment and not in anticipation of litigation, and therefore their opinions did not need to be disclosed pursuant to Pa.R.Civ.P. 4003.5. Appellants' Brief at 7.

Rule 4003.5(a) requires disclosure of the identity and the substance of the testimony of experts to be called at trial, and Rule 4003.5(b) directs that experts not disclosed in accordance with subsection (a) shall not be permitted to testify. Pa.R.A.Civ.P. 4003.5. As explained above in connection with Appellants' first argument, Rule 4003.5 is designed to prevent unfair surprise and give the opposing party an opportunity to prepare a response. *See Feden v. Conrail*, 746 A.2d 1158, 1161 (Pa. Super. 2000). But a doctor witness whose opinions arise from treatment of the litigant, and whose opinions were formed before litigation commenced, is not subject to the requirements of Rule 4003.5. *See Katz v. St. Mary Hosp.*, 816 A.2d 1125, 1127 (Pa. Super. 2003).

As to Dr. Hornicek, Appellants are not specific as to which portion or portions of his *de benne esse* deposition testimony should have been admitted. Appellants, therefore, have failed to develop a sufficient argument with respect to Dr. Hornicek's testimony, and they have failed to explain how the exclusion of his testimony was prejudicial to them.

As to Dr. Cote, Appellants wished to use his testimony to corroborate Dr. Brien's opinion on the appropriate standard of care for a chordoma. The

trial court disallowed the testimony, reasoning that because Dr. Cote is an oncologist, he was not qualified to offer a standard of care opinion regarding the performance of Dr. Gopez, who is a neurosurgeon. Trial Court Opinion, 3/29/23, at 15. The trial court relied on §512(c)(2) of the MCARE Act:

> (a) **General rule**.--No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.
>
> * * * *
>
> (c) **Standard of care**.--In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:
>
> (1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.
>
> (2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).
>
> * * * *
>
> (e) **Otherwise adequate training, experience and knowledge**.--A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period.

40 P.S. § 1303.512.

Appellants do not dispute that Dr. Cote is not qualified to testify as to the standard of care applicable to Dr. Gopez under Section 512(c)(2). They argue, however, that the trial court should have waived that requirement pursuant to Section 512(e). They rely on **Gbur v. Golio**, 963 A.2d 443 (Pa. 2009), but that case discussed Section 512(e) only in *dicta*, and the *dicta* does not support Appellants' arguments here. The Supreme Court wrote:

> [T]he statute should be read to require a close enough relation between the overall training, experience, and practices of the expert and that of the defendant-physician to assure the witness's expertise would necessarily extend to standards of care pertaining in the defendant-physician's field. … [W]e find the mere fact that two physicians may treat the same condition to be insufficient, in and of itself, to establish such a relation among their fields of medicine.

*Id.* at 459. Inherent in the Supreme Court's analysis of Section 512(e) is a requirement of record evidence to support a conclusion that the proposed expert's training, experience, and practice is sufficiently similar to the defendant's. Appellants' cite no such evidence here. Rather, they baldly assert that Dr. Cote has extensive experience in the research, diagnosis, and treatment of patients with chordomas. Appellants' Brief at 85. Appellants fail to explain how this assertion, even if supported by record evidence, is sufficient to overcome the **Gbur** Court's statement that the mere fact that two physicians treat the same condition is not sufficient to trigger Section 512(e). Appellants' fourth argument fails.

Finally, Appellants argue that the trial court erred in admitting portions of Dr. Cote's deposition testimony only in rebuttal, rather than in Appellants'

case-in-chief. Appellants' Brief at 7. In connection with this argument, Appellants assert once again that Dr. Cote met the criteria of Section 512 of the MCARE Act. Appellants' Brief at 87. Because we have concluded that he did not, Appellants' final argument fails.

In summary, we have concluded that Appellants have failed to establish any prejudicial, reversible error on the part of the trial court. The trial court did not abuse its discretion or commit an error of law in denying Appellants' motion for a new trial.

Judgment affirmed.

Judge Colins joins the memorandum.

Judge McLaughlin filed a concurring and dissenting memorandum.

This decision was reached prior to the retirement of Judge Colins.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/9/2025